Filed 6/4/25  P. v. Larrea CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MILANI CALBERTA LARREA,<br><br>Defendant and Appellant. | F087976<br><br>(Super. Ct. No. BF131238A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Kathryn L. Althizer, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

In 2012, a jury convicted defendant Milani Calberta Larrea of murder (Pen. Code, § 187, subd. (a)) and first degree robbery of an inhabited dwelling (§ 212.5, subd. (a)),

and the jury found true a robbery-murder special circumstance (§ 190.2, subd. (a)(17)(A)). (Undesignated statutory references are to the Penal Code.) The court sentenced defendant to life in prison without the possibility of parole.

Defendant petitioned for recall and resentencing under section 1172.6 in light of the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). The court denied the petition without issuing an order to show cause. Defendant previously appealed, challenging the denial of her petition on the grounds the record of conviction did not establish she was ineligible for relief as a matter of law. Our court agreed, reversed the court's order denying the petition, and remanded with directions for the court to issue an order to show cause and to hold an evidentiary hearing under section 1172.6, subdivision (d)(3). After holding an evidentiary hearing during which defendant testified, the court denied the petition, concluding defendant was the actual killer of the victim and a major participant in the commission of the underlying felony who acted with reckless indifference to human life.

Defendant now challenges the denial of her petition after the evidentiary hearing, arguing the evidence was insufficient to establish she was the actual killer or a major participant who acted with reckless indifference to human life.

We reject defendant's contentions and affirm the order denying the petition.

**FACTUAL AND PROCEDURAL HISTORY**

In 2012, a jury convicted defendant of first degree murder (§ 187; count 1) and found true a special circumstance allegation that the murder was committed during the commission or attempted commission of a robbery (§ 190.2, subdivision (a)(17)(A)). It also convicted defendant of first degree robbery (§ 212.5, subd. (a); count 2). The court sentenced defendant to life imprisonment without the possibility of parole. Our court affirmed defendant's conviction in an unpublished opinion. (*People v. Larrea* (Nov. 14, 2014, F066300).)

2.

In 2019, defendant filed a petition for resentencing pursuant to former section 1170.95, now section 1172.6, using a preprinted form. The court appointed defendant counsel and the parties proceeded to file briefing. The People filed an opposition to the petition arguing, in part, defendant was a major participant who acted with reckless indifference and she was an actual killer based on the language in our appellate opinion from her direct appeal, which concluded substantial evidence supported a conclusion she proximately caused the victim's death.

The court set the petition for a hearing and, after hearing arguments from counsel, the court held defendant was ineligible for relief. It explained, to render a true finding on the special circumstance, the jury had to conclude defendant was a major participant in the robbery and, when she committed the crime, she acted with reckless indifference to human life. The court stated, "These are factual findings the jury had to have made based on the evidence presented at the trial." Accordingly, the court stated it would accept those findings previously made by the jury. The court further stated:

> "Based on the evidence presented at the trial and specifically referring to the appellate opinion so as not to weigh or determine credibility, but only to understand the issues raised on appeal, there was evidence to support the proposition that the defendant was an actual killer in this case and that her actions proximately caused the victim's death. Her conduct, it was found, led to and became a substantial factor of the victim's death. As an actual killer, [defendant] would likewise be ineligible for relief under … Section 1170.95.

> "It is for those reasons, therefore, that this Court is going to find [defendant] is ineligible for the relief sought and her petition, therefore, is dismissed."

We previously reversed the court's order in an unpublished opinion after *People v. Strong* (2022) 13 Cal.5th 698 issued and remanded the matter with directions for the

3.

court to issue an order to show cause and to hold an evidentiary hearing pursuant to section 1172.6, subdivision (d).[1]  (See *People v. Larrea* (Nov. 28, 2022, F081268.)

***Evidentiary Hearing on Petition for Resentencing***

On remand, the court set the matter for an order to show cause hearing.  The People filed an opposition to resentencing before the evidentiary hearing, asserting the court should deny the petition for resentencing because defendant was the actual killer and/or a major participant in the underlying felony and acted with reckless indifference to human life.  They noted the trial testimony that defendant returned to the victim's trailer with duct tape bought the night before by her two codefendants, Abel Gaeta, Jr., and Ronnie D. Fleming, and she used the tape to bind the victim while her two codefendants restrained him.  They asserted that defendant used 16 feet and four inches of duct tape to bind the victim's hands behind his back and six feet and seven inches of duct tape to restrain his ankles.  They argued defendant personally did an act that caused the victim to be unable to breathe correctly or to correct his position so that death could have been avoided; thus, she was "the actual killer and the homicide occurred during the same transaction as the robbery."  They also argued defendant was a major participant in the underlying crime who acted with reckless indifference to human life.

Defendant also filed a brief before the evidentiary hearing objecting to the court taking judicial notice of the prior appellate opinion in *People v. Larrea*, *supra*, F081268, and those that followed.  Defendant also argued she was not a major participant and did not act with reckless indifference to human life.  She asserted she had no role in planning the robbery and there was no evidence she had a weapon or supplied anyone with a weapon though she knew her codefendant Gaeta had a knife.  She also argued she did not

---

[1]Our court initially affirmed the trial court's order denying the petition and defendant appealed that decision to the California Supreme Court.  The California Supreme Court vacated our opinion and transferred the matter back to our court for reconsideration after the issuance of *People v. Strong*, *supra*, 13 Cal.5th 698.

know of her codefendants' propensity for violence and "was completely unaware of the dangers" binding the victim's arms and legs with duct tape could have. She noted, when she bound the victim's limbs, he was seated on the couch. She conceded she was present at the scene of the death and reluctantly participated in the robbery but she could not have stopped her codefendants "from moving the victim from the couch area" and she "was completely unaware of the dangers of placing a person's hands behind their back." With regard to being a major participant, defendant asserted there was no evidence she was armed. She had no idea in advance that a robbery was planned and did not provide any weapons, nor were any weapons used; the robbery occurred quickly, over the course of less than 15 minutes. She conceded she was present but asserted she "was an unwilling participant" and "unable to restrain" her codefendants.

### Jury Trial Evidence

At the evidentiary hearing, the People submitted as an exhibit the reporter's transcript from defendant's underlying jury trial and the jury instructions.

At trial, Ronnie Fleming testified he met Abel Gaeta two to three years before the robbery.[2] A few days before the robbery, Fleming and Gaeta began to hang out; they were using methamphetamine and "running around." At some point, Fleming stole a car from his friend while he was asleep; Gaeta was with Fleming at the time. There was a laptop and an Xbox 360 in the backseat. About three or four days before the robbery, Gaeta took Fleming to defendant's father's home to see if they could trade the items or sell them for methamphetamine or money to buy drugs.

The day before the robbery, defendant directed Fleming to Nunley's trailer; defendant, Fleming, and Gaeta were in the car. That night, Gaeta told Fleming he wanted to go back to the trailer to rob Nunley. The two of them went to a gas station first where

---

[2]Fleming testified he agreed to testify truthfully in exchange for a sentence of 11 years for two strikes for robbery and voluntary manslaughter.

Gaeta bought duct tape and beer; defendant was not present. Fleming then drove them to Nunley's trailer. Gaeta went up to the door and knocked but no one answered. Fleming and Gaeta left and returned to the friend's house where they were staying. Defendant was there doing drugs.

At some point, all three of them got in the car. Fleming was driving, Gaeta was in the front seat, and defendant was in the backseat. Gaeta said to go by Nunley's trailer and Fleming assumed they were going to rob him. Defendant and Gaeta got out of the car and went to the front door. Gaeta came back to the car and told Fleming to come. Gaeta and defendant went inside the trailer, and Fleming was near the doorway and could see inside. Fleming did not think there was "really a plan," just that Gaeta was going to try to rob Nunley.

Fleming saw Gaeta hit Nunley in the face and then they started "scuffling," "throwing punches." Gaeta got a black eye and called for help. Fleming went in, pushed defendant out of the way, and began hitting Nunley. Fleming put Nunley in a headlock and Gaeta got one of Nunley's hands behind him. Nunley continued to hit Fleming. At that time, defendant was outside the trailer and had shut the door. Gaeta yelled at her to bring the tape. Defendant came in with the tape and taped Nunley's hands behind him and his legs together while Gaeta checked Nunley's pockets. Gaeta took a wallet from Nunley that had $500 inside. Nunley calmed down once he was taped.

Gaeta told defendant to search the back room. Defendant went back there; she did not hesitate. Defendant was back there for approximately a minute. Fleming testified that defendant "didn't really … go back there and search things." When defendant left the back room, she went outside, and Gaeta and Fleming moved Nunley to the back of the trailer. Gaeta "had his hands, and he was just pushing him" and Nunley hopped. Gaeta and Fleming then laid Nunley down on his right side. Nunley was grunting a little bit and Fleming put a rag over Nunley's eyes. Fleming then began digging in a cabinet that had videotapes in it and some drawers. He and Gaeta loaded up a bin and Gaeta

6.

handed defendant stuff to put in the car. Defendant took the bin but then came in and told Gaeta someone was there; they both walked out. Fleming followed; he was holding a white box that had costume jewelry in it. They walked behind the trailer. Gaeta had a bat in his hand he got from the trailer and he was arguing with a lady in a pickup truck and yelling at her. Fleming went past him and got in the car. Fleming told defendant to get in. She got in the passenger seat and closed and locked the door. Gaeta started arguing with defendant. Fleming told defendant to open the door and let Gaeta in. Defendant told Gaeta to ride a bicycle.[3] Defendant ultimately unlocked the door and got in the backseat. Gaeta got in the passenger seat.

As they drove away, Gaeta and defendant were fighting because defendant did not put the bin he gave her in the car and she locked him out. Fleming testified defendant said the bin was too heavy but "she was still trying to take the welder." Gaeta was trying to hit defendant with the bat and he told Fleming to "take her to a field." Gaeta told Fleming "he wanted to kill her" because he did not trust her. Fleming told Gaeta he would watch defendant and Gaeta calmed down a little. They returned to the house where they were staying and took all the stuff inside including a laptop computer and a portable DVD player. Gaeta gave Fleming $200 and defendant $100 from the money in Nunley's wallet. They also divided up the methamphetamine Gaeta had taken from Nunley's pockets.

Gaeta left and defendant and Fleming continued to stay together at the residence. They stayed there for two or three days. Defendant's father was watching the news and learned Nunley died. Defendant told Fleming and they "took off." Fleming took the DVD player and backpack with the bat in it with him.

---

[3]There was a bicycle outside the trailer. Fleming did not recall defendant saying she took the bicycle because she wanted to get out of there.

Defendant and Fleming met up with Jesse Tapp and asked him for a ride. Tapp had his girlfriend take defendant to a motel room; Fleming joined defendant there later. Defendant told Fleming she saw on the news that Nunley had died. They "got some more dope" and Tapp told Fleming that he and defendant could stay at his house in Bakersfield. Fleming and defendant stayed the night at Tapp's house and the next morning "the cops just walked in" and arrested Fleming. Detective Dossey interviewed Fleming on March 5, 2010, and Fleming explained what happened at Nunley's trailer. Fleming reported they never intended to kill Nunley, they were just going to rob him. He noted they never talked about their intent to rob Nunley "as a group." But defendant did not seem to have a problem with what occurred based on what she said or did. "She was taking stuff."

Carla L. testified she and her husband went to Nunley's trailer on the morning of February 17, 2010, because a relative had not heard from him in a few days. They parked behind Nunley's trailer a few feet from a white car that was parked facing them. As Carla's husband went through the gate around the trailer, she saw three people, one female and two males, walking away. She identified Gaeta as possibly one of the men she saw. Carla heard the female say, "'Who the "F" is that?'" And one of the males said, "'Get the "F" in the car.'"

Police found Nunley lying on his right side in the rear portion of the trailer. Nunley's hands and feet were bound with duct tape. Pieces of duct tape wrapper were found outside the door of the trailer and on the steps leading into the victim's trailer. A Styrofoam cup was found on the ground outside of the trailer and tested for fingerprints. A latent print was found on the cup and it was entered into an automated identification system that matched the print to defendant.

Forensic pathologist Dr. Lesley Wallis-Butler conducted an autopsy of Nunley's body. Nunley's hands were bound behind his back with duct tape and his ankles were also bound together by duct tape. Dr. Wallis-Butler testified the duct tape was wrapped

approximately five to six times around the left wrist "and around the right wrist at least once with a loop hanging between the two." Nunley had three small lacerations to the side of his left eyebrow, a small laceration to the right eyebrow area, small abrasions to both sides of the head area, and an abrasion to the back of the right shoulder. Nunley's heart evidenced "significant coronary artery disease" but there was nothing to indicate that it would have killed him by itself. Nunley's lungs were heavy and congested and he had some sort of injury to the back of his nose or posterior pharynx that caused him to aspirate blood down into his lungs. Nunley had "a moderate amount" of methamphetamine in his system. Dr. Wallis-Butler diagnosed Nunley with a "clinical history of positional asphyxia" and "blunt-force trauma, multiple contusions, … sternocleidomastoid [referring to a muscle in the neck] hemorrhage, and … facial lacerations." She explained that positional asphyxia "means that the individual was in a position where he couldn't protect his airway, being his nose and mouth. He was in a position such that the nose and mouth were obstructed by something," and there is "an underlying mechanism … that is not allowing that individual to make sure that their nose and mouth are unobstructed." Additionally, Nunley's arms and legs were bound, he had hardening of the arteries known as atherosclerotic cardiovascular disease, and methamphetamine intoxication. Dr. Wallis-Butler explained that having the arms behind the back inhibits respiratory muscles; "[i]t's very hard to maintain that position." "Given the fact that [Nunley] was in that bound position on his right side with his head sort of wedged between the wall and what looks like a space heater or some sort of fan device, his nose and mouth were pointed towards the floor, it was in such a position that he wasn't able to move his airways." With regard to cause of death, Dr. Wallis-Butler could not "differentiate between all the mitigating factors," so she had to "put it all together." "[S]o cause of death was positional asphyxia associated with the blunt-force trauma and the extremity binding, along with the contributory factor of the methamphetamine intoxication." She ruled the manner of death as a homicide.

9.

During the autopsy, the police collected the duct tape that was removed from Nunley's hands and feet. The duct tape from defendant's feet was unraveled; it was one piece that measured approximately six feet, seven inches long and was wrapped around the victim's ankles approximately four times. The duct tape retrieved from the victim's hands was also unraveled and measured 16 feet, four inches long. DNA profiles extracted from three pieces of duct tape wrapper matched defendant as a major contributor.

Jesse Tapp testified he encountered defendant and Fleming on February 20, 2010. Defendant and Fleming went to Tapp's motel room; they had quite a bit of possessions with them, including a DVD player, a laptop, and a backpack, that they gave to Tapp and Tapp eventually gave to the police. Tapp told them to go stay at his house and calm down because Fleming was hysterical.

### Defendant's Testimony at the Evidentiary Hearing

At the section 1172.6 evidentiary hearing, defendant testified she met her codefendant, Abel Gaeta, before February 2010; he used to buy and sell drugs for her father. On February 15, 2010, Gaeta brought Ronnie Fleming to defendant's father's house to try to trade items for drugs; defendant's father declined to trade and told them to take defendant with them. Defendant was "running around with" Gaeta and Fleming. They were stopping at different places "trying to trade the stuff" and defendant directed them to a trailer park where they encountered Nunley. Nunley asked defendant what she needed and she told him Gaeta and Fleming wanted to trade game equipment or cameras for methamphetamine because they did not have any cash. Defendant went back to Gaeta and Fleming and told them Nunley wanted cash; Gaeta then gave her $35. Defendant went back to Nunley and he told her to direct Gaeta and Fleming to pull around the back. Defendant paid Nunley $35, and he gave her the drugs. Gaeta and Fleming dropped defendant off at her friend's house.

In the morning, Gaeta and Fleming returned and convinced defendant to go with them. They told her they were going somewhere else but then turned down a street to go to Nunley's trailer. They wanted defendant to buy them more drugs; they did not mention a plan to rob Nunley. Fleming parked behind the trailer like he had done when they previously bought drugs. Defendant told them she needed money if she was going to buy drugs. Gaeta pulled out a knife and told defendant to just go get the drugs. Gaeta did not "look normal," he looked like "he had been high" and defendant was scared.[4]

Defendant walked to the door, which was wide open. She planned to tell Nunley to give her some drugs and she would pay him back; she did not know Gaeta was following behind her. Defendant stepped into the trailer and greeted Nunley. She saw him looking behind her. She realized then that Gaeta was behind her. She started to introduce Gaeta and Gaeta pushed past her and started fighting Nunley "instantly." Defendant did not intervene. She testified, "[E]verything slowed down really super slow motion. It felt like my brain couldn't comprehend what was happening." She stated she "went into shock."

At some point during the fighting, Gaeta started asking for help and Fleming pulled defendant away from the door and went into the trailer. Defendant "stood there watching for … a few seconds" because she "couldn't understand what was happening." Then, she "closed the door and … started pacing back and forth." She did not know what to do and "felt very confused." She grabbed a bike and was going to "take off" when Gaeta started yelling her name. She "went back because [she] got scared." She testified she had known Gaeta for a while and feared he would harm her family; she did not "know what he's capable of."

---

[4]Defendant testified Gaeta previously had held her "hostage" at his mother's house on or about the night of February 14, 2010. Gaeta believed defendant had brought people there to kill him because the dogs were barking. "He was in a state of paranoia a lot."

Defendant reentered the trailer and saw Fleming holding Nunley in a chokehold. Nunley was on his stomach. Gaeta handed defendant the duct tape. Defendant duct taped Nunley's hands behind his back and his ankles together. Defendant "told [Gaeta she] didn't want to. He said, no, you're gonna do it." Gaeta started yelling at her so she pulled the sleeves of Nunley's jacket down because, in her mind, she "was thinking he would be able to move … if [she] just taped the skin he wouldn't be able to have movement of his wrist because the tape would be on the skin" Gaeta yelled at her to do it tighter. Defendant "snapped the tape because [she] did it so tight and it hit Gaeta and he got angrier." Defendant testified she was crying and apologizing to Nunley. Gaeta then made defendant "move to his feet." Defendant pulled Nunley's pant legs down to make sure his skin was covered and she put duct tape around his pants. Fleming then sat Nunley up next to him on a couch.

Gaeta told defendant to search the bedroom. She went in the room but did not look for anything and then walked back up front. Nunley was seated on the couch next to Fleming at that time. Gaeta pushed defendant out of the trailer and started to yell at her. He gave her a Tupperware bin and told her to put it in the car. Defendant testified she did not put the bin in the car; she put it under the trailer. She denied loading anything in the car.

Defendant began pacing again; she was "trying to figure out what to do." A truck pulled up and defendant went to tell Gaeta and Fleming, "not because [she] was looking out but because it was all gonna be over with." She was walking to the back of the trailer when they came out. Gaeta grabbed her arm and pushed her towards Fleming; he directed Fleming to take her to the car. Fleming got in the car. Gaeta was yelling at defendant to get in while also yelling at the lady in the truck to stay in the truck. Defendant got in the car and locked Gaeta out. Fleming talked defendant into getting into the backseat and then he unlocked the door so Gaeta could get in.

Defendant denied knowledge that any of Nunley's property was in the car. While they were driving away, Gaeta threatened defendant: "[t]hey were gonna take [her] to a field and kill [her]." Gaeta had a knife and was telling Fleming to drive to a field so he could kill her. He also tried to hit defendant with a bat. Gaeta and Fleming agreed that if defendant told on either of them, the other could kill her. The three of them went to another house. Defendant denied staying with Fleming and Gaeta off and on for three days after the incident but testified she and Fleming went to seek help from an individual named Jesse Tapp.

### *Argument and Findings at the Section 1172.6 Evidentiary Hearing*

The court took judicial notice of the procedural history of the case from its own records. Defense counsel argued the pathologist's testimony at trial that she had to cut off Nunley's clothing to remove the duct tape corroborated defendant's statement that she pulled Nunley's sleeves down before duct taping his arms. Defense counsel also argued the doctor said "there were several factors that led to the conclusion of Mr. Nunle[y]'s death, but the two factors that are most important are the damage to his throat caused by the headlock which would lead to difficulty breathing, plus there was some damage to his face from the initial fist fight. But it was the fact of placing him on a side in a location that he could not move from. And the person who did that was Mr. Fleming and Mr. Gaeta not [defendant]." She asserted "putting duct tape or putting someone's hands behind their back" is not "solely the reason why someone suffers from asphyxiation …. It's the idea of that in combination with placing him on his side where … there wasn't enough breathing room." She asserted, on that basis, "looking at who did what, [defendant] was not the actual killer."

Regarding whether defendant was a major participant who acted with reckless indifference to human life, defense counsel noted defendant "clearly was a participant in the robbery," whether or not she knew in advance about the plan to rob. She argued there is a subjective and an objective component in considering whether defendant acted with

reckless indifference to human life; the subjective component requires the person be aware of the danger of the action he or she is undertaking. She argued that defendant was not aware of the high risk of death that would come from her actions because the danger of duct taping someone's hands and feet was not readily apparent at the time.

The prosecutor argued the court should not find defendant credible because she "clearly has a bias and a motive … to craft her statements a certain way." He asserted a lot of defendant's testimony was "contradicted by the evidence that was admitted at this trial," particularly by Fleming's testimony and the testimony by the victim's son that his father's DVD player was missing and Tapp testifying he saw defendant and Fleming in possession of the DVD player when he encountered them after the incident. He argued defendant was present during the robbery; Fleming testified they were going there to commit a robbery; defendant "clearly participated in this robbery to a large extent," tying up the victim to enable it and helping search the residence; and there was evidence she was in possession of stolen goods after the robbery. He asserted, there was testimony defendant retrieved the duct tape from the vehicle, returned to the trailer, and strategically duct taped Nunley so he could not move at all, using 16 feet and four inches to bind his wrists and six feet and seven inches of duct tape to bind his feet. The prosecutor asserted, "That action was deadly. It was a substantial factor in causing the victim's death." He argued she was the actual killer on that basis. He also asserted defendant was a major participant who acted with reckless indifference to human life, noting in part: defendant took property from the trailer including Xanax; she tied up the victim; she served as a lookout; she stayed with her coperpetrators for three days after the incident; and she was in possession of stolen property afterwards.

After the parties presented their arguments at the evidentiary hearing and the court reviewed the trial transcript, the court addressed its credibility determinations. The court found:

14.

"The defendant's testimony versus other evidence presented during this hearing does leave a lot to be lacking regarding what credibility, if any, to give to the defendant. The defendant testified that she did not get the tape from the vehicle. That she did not take anything from the back room of the RV. That she did not take any property from the victim's residence. That she did not put any of the victim's property in the vehicle. That she did not have any of the victim's property after the robbery. That she did not, therefore, participate in divvying up the property between her cohorts, specifically referencing $500 in cash that was split three ways, 200 to Gaeta, 200 to Fleming, and 100 to the defendant.

"The defendant … testified she did not stay with Fleming after the robbery. That she did not see Gaeta after the robbery. And … she testified she did not end up with anything after the robbery.

"These denials in the face of all the other evidence does lead the Court to not believe the defendant's testimony today, whether it be in its entirety or partially as counsel would suggest the Court do.

"The Court has been presented with two theories for which the defendant could be found guilty of murder. One is that she was the actual killer. And two is that she was a major participant with reckless indifference to human life. Regarding … the actual killer option, based on the evidence presented to the court, the Court will find that it has been proven beyond a reasonable doubt that the defendant was the actual killer.

"The defendant personally bound the victim's hands behind his back. The defendant personally bound the victim's ankles. This was a substantial factor in the victim's death in that he could not breathe. Hands bound behind the back inhibited the victim's respiratory muscles. Legs bound prevented the victim from getting out of the position from which he was placed. And the victim died of positional asphyxia. That is directly related to the defendant's personal … conduct in this case.

"The Court will therefore reiterate that it has been proven to the court beyond a reasonable doubt that the defendant was the actual killer in this case.

"Regarding the other theory, a major participant with reckless indifference for human life or reckless disregard for human life, the Court is guided by cases that have been ruled on, such as Clark, Banks, Strong and even In Re Scroggins. Those were all referenced in counsel's paperwork in this case and they have been pivotal cases in this subject matter for the last one or two years.

15.

"In determining whether the defendant was a major participant and in finding so, with reckless disregard for human life, the Court will note what the evidence has demonstrated. The defendant knew that the robbery in this case was going to occur based on her testimony today. She indicated that per her testimony when she went to get money from Gaeta for the drugs on February 17th, Gaeta pulled out a knife and told her that's how he was going to get the drugs. That occurred outside of the trailer or the RV.

"Thereafter, the defendant goes … to the victim's door with Gaeta behind her. She was present at the scene when the assault began. She was present when Fleming came in to assist Gaeta in assaulting the victim. The defendant also obtained a weapon to assist in the robbery, specifically referencing duct tape. The defendant then personally duct taped the victim's hands and feet to make sure the victim could not move. She used 16 feet, four inches of tape around the wrists to secure the wrists and six feet, seven inches of tape around the ankles to secure the ankles. The defendant in this conduct did aid in facilitating the murder.

"The defendant also never prevented the crime from occurring. She did not make any efforts to minimize the risk of violence during this robbery. After the force was used on the victim, the defendant and her cohorts gathered the victim's property, specifically money, drugs, and personal property. The defendant and her cohorts fled the scene in the vehicle. The defendant and her cohorts divvied up the victim's property. The defendant and her cohorts were seen within days after the robbery with the victim's property.

"The defendant's conduct in this case demonstrates that she was a major participant in the robbery with reckless indifference to human life. The People have proven beyond a reasonable doubt that the defendant is guilty of murder during the commission of the robbery."

Based on its findings, the court denied defendant's petition for resentencing.

## DISCUSSION

Defendant now challenges the trial court's findings at the evidentiary hearing and contends she is entitled to recall and resentencing. As discussed herein, we reject defendant's contentions and affirm the court's order.

## I.     Senate Bill 1437 and Senate Bill No. 775

On September 30, 2018, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. Senate Bill 1437 "amend[ed] the felony murder rule and

16.

the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amended section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Accordingly, section 188 now provides that "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. *Malice shall not be imputed to a person based solely on his or her participation in a crime*." (§ 188, subd. (a)(3), italics added.) The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Additionally, former section 189 previously stated, "All murder … which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." Senate Bill 1437 amended section 189, in part, by adding subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

The legislation also added section 1172.6 (former § 1170.95), which provides a procedure by which defendants whose cases are final can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, § 4.) Initially, section 1172.6 (former § 1170.95) permitted those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts …." (Stats. 2018, ch. 1015, § 4, subd. (a).)

In Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), effective January 1, 2022, the Legislature amended the language of this section to expand the scope of the petitioning procedure. (Stats. 2021, ch. 551, § 2.) Under the amended statute, if the petitioner has made a prima facie case for relief, the court "shall issue an order to show cause." (§ 1172.6, subd. (c).) Within 60 days after the order to show cause has issued, the trial court must then hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).)

> "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another

18.

exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## II. Standard of Review

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) We will not reverse unless it appears that upon no hypothesis is there sufficient substantial evidence to support the fact-finder's findings. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "If there is conflicting testimony, we must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them." (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

19.

**III. Sufficient Evidence Supports the Trial Court's Finding Defendant Was the Actual Killer**

First, we reject defendant's contention the evidence was insufficient to support the trial court's finding she was the actual killer.

**A.    Applicable Law**

"[T]he term 'actual killer' is meant to distinguish the person who actually caused the victim's death, including in circumstances where two or more persons participated in the felony." (*People v. Garcia* (2022) 82 Cal.App.5th 956, 968.)  Stated differently, the term is used to describe a person who "personally killed" the victim.  (*People v. Jennings* (1988) 46 Cal.3d 963, 979; accord; *People v. Vang* (2022) 82 Cal.App.5th 64, 88 [the term "actual killer" is limited to "the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act"].)  Thus, "the meaning of 'actual killer' … is literal.  The actual killer is the person who personally kills the victim, whether by shooting, stabbing, or" other means.  (*People v. Garcia* (2020) 46 Cal.App.5th 123, 152.)  By contrast, courts have held that a person who only "commits an act that is the proximate cause of the victim's death" is not an "actual killer."  (*People v. Lopez* (2022) 78 Cal.App.5th 1, 17; see *id.* at pp. 16–18; see also *People v. Garcia*, *supra*, at p. 150, fn. 29 ["proximately causing the death of another does not fall within the actual killer prong of section 190.2[, subdivision] (b)"].)  That is, in different contexts, our Supreme Court and various Courts of Appeal have "explained that '[p]roximately causing and personally inflicting harm are two different things.'" (*People v. Garcia*, at p. 151 [collecting cases].)

**B.    Analysis**

Defendant contends the evidence was insufficient to establish she was the actual killer.  She concedes her "role in the incident was duct taping the victim's hands and feet," but argues there "was no evidence the defendants planned to kill the victim," "the plan was only to commit a robbery," and "[n]o reasonable person would believe that

20.

merely taping someone's hands behind his or her back would result in the person's death." She asserts the pathologist testified the victim "'was in a position where his hands were behind his back—and if you are kept in that position for a length of time, it's going to inhibit your respiratory muscles. Given the fact that he was in that bound position on the right side with his head sort of wedged between the fan and the wall and what looks like a space heater or some sort of fan device, his nose and mouth were pointed towards the floor, it was in such a position that he wasn't able to move his airways.'" She asserts Fleming and Gaeta placed the victim in the position which impaired his breathing, and "[t]his was the act that pushed Nunley over the edge to death." Accordingly, she argues her "conduct was not the proximate cause of … death" and Nunley's death was not a "direct, natural and probable consequence" of her act of binding him. She relies upon *People v. Garcia*, *supra*, 46 Cal.App.5th 123 and *People v. Vang*, *supra*, 82 Cal.App.5th 64 to argue for a "restrictive view" of the phrase "actual killer." She contends it is "clear she was not the literal killer." Thus, she argues, the trial court's conclusion she was the actual killer was not supported by substantial evidence. We disagree with defendant's contentions and conclude substantial evidence supports the trial court's finding defendant was the actual killer; thus she is ineligible for resentencing on that basis.

Here, the evidence presented at trial and admitted at the evidentiary hearing, including but not limited to defendant's testimony and Fleming's testimony, established defendant used duct tape to bind Nunley's hands behind his back and his legs together. Indeed, this fact is undisputed by the parties. And the forensic pathologist testified Nunley's cause of death was positional asphyxia related to the extremity binding, which inhibited Nunley's respiratory muscles and prevented him from clearing any obstructions to his breathing. Thus, there is substantial evidence defendant *personally committed* an act that *directly* caused the victim's death. Contrary to defendant's suggestion, the prosecution was not required to prove that she had the intent to kill for the court to

21.

conclude beyond a reasonable doubt that she was the "actual killer" such that she could be convicted of felony murder on that basis. (See *People v. Garcia*, *supra*, 82 Cal.App.5th at p. 967 ["As amended by Senate Bill No. 1437, the text of section 189 provides no additional or heightened mental state requirement for the 'actual killer' prosecuted under a felony-murder theory; it requires only that '[t]he person was the actual killer.' (§ 189, subd. (e)(1).)"]; *People v. Vang*, *supra*, 82 Cal.App.5th at p. 88 ["Generally, the 'actual killer' need not have acted with any intent to kill"]; see also *People v. Thompson* (1990) 50 Cal.3d 134, 187 ["As to the actual killer in a felony murder, intent to kill is not legally required as a prerequisite to imposition of the death penalty"]; accord, CALCRIM No. 540A ["A person [who was the actual killer] may be guilty of felony murder even if the killing was unintentional, accidental, or negligent"].) The fact that Gaeta and Fleming laid the victim down does not change the fact substantial evidence supports the trial court's conclusion the victim's death occurred as a direct consequence of the defendant's personal act of binding Nunley's extremities.[5] (See generally *People v. Garcia*, *supra*, 82 Cal.App.5th at pp. 970–971 [affirming denial of defendant's § 1172.6 petition for relief because defendant was "actual killer" under the amended law where 82-year-old victim's death resulted from aggravation of preexisting medical condition by stress of underlying felony, noting "[t]his conclusion is not undermined by the fact that [the victim's] preexisting condition contributed to his death"]; *id*. at p. 967 ["With respect to felony-murder liability, Senate Bill No. 1437 … contains no expressed intent to modify the felony-murder rule's application to a perpetrator whose acts were a concurrent cause of the death"].)

---

[5]For these same reasons, there is also substantial evidence to support a conclusion that defendant's act of binding Nunley's limbs was the proximate cause of, or a substantial factor contributing to, Nunley's death. (See *People v. Carney* (2023) 14 Cal.5th 1130, 1138 ["when there is evidence of concurrent causes, we have held that '"[t]o be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical"'"].)

*People v. Vang*, *supra*, 82 Cal.App.5th 64 and *People v. Garcia*, *supra*, 46 Cal.App.5th 123 do not assist defendant. In *Vang*, the defendant was charged and convicted in part of the murder of his wife during the course of a kidnapping after his wife jumped from the moving car he was driving and she died. (*Vang*, at p. 69.) Evidence of prior domestic abuse was presented at trial. On appeal, Vang argued the trial court erred by permitting the prosecution to proceed under a felony-murder (with a special circumstance) theory at trial because the evidence showed his wife "jumped from the truck of her own volition, and there was no evidence that defendant directly caused her death," so "he was not the actual killer as a matter of law." (*Vang*, at p. 80.) He argued the jury instructions improperly allowed the jury to conclude he was an actual killer and convicted him of felony murder based on general causation principles. (*Ibid*.)

Citing the bill as introduced, the *Vang* court stated, "[t]he legislative history [of Senate Bill 1437] … supports the view that the Legislature understood the term 'actual killer' to mean the person who 'personally' commits the homicidal act." (*Vang*, *supra*, 82 Cal.App.5th at p. 86.) The *Vang* court held:

> "In light of Senate Bill No. 1437's intent to impose punishment commensurate with the person's culpability, we conclude that the term 'actual killer' was intended to limit liability for felony murder—in cases where section 189, subdivision (e)(2) or (3) do not apply—to the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act. In other words, the intent was to conform California law to the 'agency theory' of felony-murder liability, under which criminal culpability is restricted to deaths directly caused by the defendant or an accomplice, as distinguished from the 'proximate cause' theory of felony murder, under which a defendant is responsible for any death that proximately results from the unlawful activity." (*Vang*, at p. 88.)

"Generally, the 'actual killer' need not have acted with any intent to kill." (*Ibid*.) The *Vang* court noted the instructions in that case allowed the jury to find the defendant guilty of felony murder, and to find the special circumstances true, if it determined the defendant "caused" his wife's death based on general causation principles, even if it did

not find, beyond a reasonable doubt, that he personally committed the homicidal act, which was a legally invalid theory. (*Id*. at p. 91.) *Vang* held the evidence did not permit any inference that the defendant was the direct cause of his wife's death so, "the evidence was insufficient to support the theory of guilty on which the jury was instructed," and the defendant could not be retried on the felony-murder theory or the felony-murder special circumstance. (*Ibid.*)

*Vang* noted its analysis was consistent with *People v. Garcia*, *supra*, 46 Cal.App.5th 123. In *Garcia*, two defendants were convicted of first degree murder, among other crimes, and the jury found true special circumstance allegations that the murder was committed during the course of a robbery. (*Id*. at p. 131.) The convictions stemmed from a home-invasion robbery during which one of the homeowners died after his arms and legs were bound and his face was duct taped. (*Id.* at pp. 134–136.) The forensic pathologist testified the homeowner had a "'very, very bad heart'" that required more oxygen, and the tape over his mouth obstructed his nasal passages, and "the physiological stress and terror of the crime would have placed additional stress on [the] diseased heart." (*Id*. at p. 136.) In analyzing the dead victim's body, the pathologist observed signs indicative of asphyxia or a heart attack and other signs that suggested suffocation. (*Ibid*.)

Notably, the *Garcia* court concluded there was sufficient evidence from which a reasonable juror could find that one of the defendants (Austin) was the "actual killer" of the victim because there was "direct evidence"—including the defendant's DNA on a piece of duct tape and on an empty duct tape roll—that the defendant "personally handled the roll of duct tape from which the tape placed over [the victim]'s face was taken."[6]

---

[6]In a concurring and dissenting opinion in *Garcia*, Acting Presiding Justice Mihara disagreed with the majority's conclusion sufficient evidence presented at trial supported an actual killer theory on the special circumstance, asserting "no evidence that the majority opinion identifies could support a finding beyond a reasonable doubt that *Austin himself placed the tape over [the decedent's] mouth*." (*People v. Garcia*, *supra*, 46 Cal.App.5th at p. 191.) Relatedly,

(*People v. Garcia*, *supra*, 46 Cal.App.5th at p. 145.)  Nevertheless, the *Garcia* court held the jury was erroneously instructed because the standard instruction for the felony-murder special circumstance, CALCRIM No. 730—which required only that the "defendant did an act that caused the death of another person"— was inconsistent with the law because it allowed the jury to find the defendant guilty as an actual killer based on general causation principles.  (*Garcia*, at p. 156, fn. 33.)  That is, the jury instruction "failed to properly limit the special circumstance liability to a defendant who actually killed and erased the difference between liability for first degree felony murder and the special circumstance" by only requiring the defendant to do "'an act that caused the death of another person.'"  (*Id*. at p. 150.)  Furthermore, consistent with the given instruction, the prosecution in *Garcia* argued the defendant was an "actual killer" because he handed the "'instrumentality of death'" (a roll of duct tape) to a coperpetrator who used it to cover the victim's face.  (*Id*. at p. 149; see *id*. at pp. 152, 154.)

Drawing from California Supreme Court cases discussing the concept of an "actual killer," the *Garcia* court explained the meaning of the phrase is ""particular and restricted"" and its application must be "literal."  (*People v. Garcia*, *supra*, 46 Cal.App.5th at p. 155; see *id*. at p. 152.)  It held "[t]he actual killer is the person who personally kills the victim, whether by shooting, stabbing or—in this case—taping his mouth closed, resulting in death by asphyxiation."  (*Id*. at p. 152.)  Accordingly, the *Garcia* court concluded the jury should have been instructed it could find the special circumstance allegation true only if the prosecution proved the defendant "'personally killed'" the victim.  (*Id*. at p. 155.)  *Garcia* held that because the instructions given erroneously failed to limit liability to the "actual killer," they permitted the jury to find the defendant guilty based on an invalid legal theory.  (*Id*. at pp. 150, 155.)  Noting the

Acting Presiding Justice Mihara concluded, "The trial court erred by instructing the jury on the actual killer theory because that theory was not supported by substantial evidence."  (*Id*. at p. 196.)

25.

prosecution expressly relied upon the invalid legal theory, the *Garcia* court reversed the special circumstance finding because it could not conclude the instructional error was harmless beyond a reasonable doubt. (*Id*. at p. 157.)

But unlike in *Vang* and *Garcia*, the evidence here establishes defendant *personally committed* the act that directly caused the victim's death—she bound his arms and legs together and his death was caused by positional asphyxia. Thus, these cases are inapposite. Rather, viewing the evidence in the light most favorable to the trial court's finding, as we must, we conclude there was sufficient evidence to support the trial court's conclusion defendant was the actual killer. Put differently, we cannot conclude that """"upon no hypothesis whatever is there sufficient substantial evidence to support"""" the court's finding that defendant was the actual killer. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) Notably, even if the record could support a contrary finding, it does not diminish the substantial evidence supporting the trial court's finding. (See *People v. Romero* (2008) 44 Cal.4th 386, 400.)

Because we conclude substantial evidence supports the trial court's conclusion defendant was the actual killer, we reject defendant's contention the court erred in denying her petition for resentencing.

## IV. Substantial Evidence Supports Finding Defendant Was a Major Participant in the Underlying Felony Who Acted With Reckless Indifference to Human Life

Next, we conclude substantial evidence also supports the trial court's finding that defendant was a major participant in the underlying felony who acted with reckless indifference to human life when she participated in the robbery.

### A. Applicable Law

Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole…. For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d)

permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674.) By incorporating this requirement, section 190.2 codified the holding of *Tison v. Arizona* (1987) 481 U.S. 137, bringing California law "into conformity with prevailing Eighth Amendment doctrine." (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393; accord, *People v. Clark* (2016) 63 Cal.4th 522, 609; *People v. Estrada* (1995) 11 Cal.4th 568, 575; *In re McDowell* (2020) 55 Cal.App.5th 999, 1004.) Section 190.2 thereby requires courts to "examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*People v. Banks* (2015) 61 Cal.4th 788, 801.)

In *Enmund v. Florida* (1982) 458 U.S. 782 the United States Supreme Court held the death penalty could not constitutionally be imposed on a robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill or any culpable mental state. (*Id.* at pp. 798, 801; *In re Scoggins*, *supra*, 9 Cal.5th at p. 675.) Distinguishing *Enmund*, *Tison* held the death penalty could be lawfully imposed on two defendants, brothers who helped their father and his cellmate—both convicted murderers—escape from prison. (*Tison v. Arizona*, *supra*, 481 U.S. at pp. 150–152.) The brothers locked up the prison guards and armed the two prisoners during the escape. (*Id.* at p. 139.) A few days later, the group's vehicle got a flat tire. (*Ibid.*) One of the brothers flagged down a passing car for help while the other four armed themselves and lay in wait by the side of the road. (*Id.* at pp. 139–140.) The group then kidnapped at gunpoint the family of four in the car, robbed them, and drove them into the desert. (*Id.* at p. 140.) The sons stood by while the father and cellmate shot the victims repeatedly. (*Id.* at p. 141.) The perpetrators left the family—which included a toddler and a teenager—to die in the desert, and drove off in the family's car. (*Id.* at pp. 140–141.) *Tison* held the Eighth Amendment does not prohibit imposition of the

death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Tison*, *supra*, at p. 152; see *id.* at pp. 157–158.)

*Enmund* and *Tison* helped define the constitutional limits for punishing accomplices to felony murder and establish a "'spectrum of culpability,'" with felony murderers who "'actually killed, attempted to kill, or intended to kill'" at one end, and minor actors who were not present on the scene and neither intended to kill nor had any culpable mental state at the other end. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 675; accord, *People v. Banks*, *supra*, 61 Cal.4th at pp. 794, 800; *In re Loza* (2017) 10 Cal.App.5th 38, 46.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than … Enmund's, lies the constitutional minimum" required for the imposition of a sentence of death or life without the possibility of parole. (*Banks*, at p. 802.) *Tison* and *Enmund* did not establish a ceiling or a floor for determining when an aider and abettor is eligible for such a sentence, however. (*In re Miller* (2017) 14 Cal.App.5th 960, 974, fn. 4; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1014, fn. 4.) The fact a particular defendant appears more culpable than Enmund does not automatically make him death eligible; conversely, neither must a defendant be as culpable as the Tison brothers in order for section 190.2, subdivision (d) to apply. The question is one of degree. (*Miller*, *supra*, at p. 974, fn. 4; *Bennett*, *supra*, at p. 1014, fn. 4.)

In *Banks*, our state Supreme Court clarified the meaning of the "major participant" and "reckless indifference" to human life requirements. *Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*People v. Banks*, *supra*, 61 Cal.4th at p. 794.) The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers

28.

posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Ibid.*)

*Banks* found insufficient evidence to show the defendant there—a getaway driver for an armed robbery—was a major participant who acted with reckless indifference.  (*People v. Banks*, *supra*, 61 Cal.4th at pp. 804–805, 808, 811.)  No evidence established his role in planning the robbery or procuring the weapons; during the robbery and murder he was absent from the scene, sitting in a car and waiting; and no evidence showed he had any role in instigating the shooting, or could have prevented it.  (*Id.* at p. 805.)  He was "no more than a getaway driver," like Enmund.  (*Ibid.*)

The following year, in *Clark*, the court addressed the "reckless indifference" determination.  (*People v. Clark*, *supra*, 63 Cal.4th at pp. 614–623.)  Reckless indifference to human life may be "'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'  [Citation.]"  (*Id.* at p. 616, quoting *Tison v. Arizona*, *supra*, 481 U.S. at p. 157.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*People v. Clark*, *supra*, at p. 617.)  Reckless indifference to human life has both a subjective and an objective component.  (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)  Subjectively, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'"  (*Ibid.*, quoting *People v. Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.)  Objectively, "''[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the

29.

circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'"" (*Scoggins*, *supra*, at p. 677; accord, *Clark*, at p. 617.)

*Clark*, like *Banks*, listed various factors to be considered when determining whether a defendant acted with reckless indifference: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677, citing *People v. Clark*, *supra*, 63 Cal.4th at pp. 618–623 [listing factors].)

Based on these factors, *Clark* concluded the defendant there did not act with reckless indifference to human life. (*People v. Clark*, *supra*, 63 Cal.4th at p. 623.) The *Clark* defendant was the "mastermind who planned and organized" a computer store robbery and waited across from the store's parking lot when the fatal shooting occurred. (*Id.* at pp. 612, 619.) His plan called for the robbery to take place after the store closed, when there would be fewer people present, for any remaining employees to be handcuffed, and for the use of a single, unloaded gun. (*Id.* at pp. 620–622.) However, during the attempted robbery the mother of one of the employees—who had come to pick him up from work—entered the store, surprising the robbers, and the defendant's accomplice shot her. (*Id.* at p. 537.) As police cars arrived, the defendant fled the scene, leaving the shooter behind. (*Ibid.*) *Clark* concluded the defendant—who was not armed, was not physically present in the store when the shooting occurred, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present and the use of an unloaded gun—did not

act with reckless indifference to human life. (*Id.* at pp. 611, 618–623; *In re Scoggins*, *supra*, 9 Cal.5th at p. 676.)

Our Supreme Court considered the reckless indifference inquiry in *In re Scoggins*, *supra*, 9 Cal.5th 667. *Scoggins* found an insufficient showing of reckless indifference where the defendant planned an unarmed assault and robbery in which one of his accomplices deviated from the contemplated plan and unexpectedly killed the victim. (*Id.* at pp. 671–672.) There, the defendant was swindled by the victim in the purchase of three television sets. (*Id.* at p. 671.) In response, the defendant recruited two close friends to ambush the victim, "'beat the shit'" out of him, and get the defendant's money back, while the defendant waited at a nearby gas station. (*Id.* at pp. 671, 678.) When the victim arrived, one of the friends pulled out a gun and shot him. (*Id.* at p. 672.) In concluding the evidence was insufficient to establish the defendant acted with reckless indifference, the *Scoggins* court considered that he was not present at the scene of the murder, he was not in a position to restrain the shooter, he did not know a gun would be used, he attempted to minimize the risk of death by ordering the assault to occur in a public place in broad daylight, and he acted ambiguously after the shooting. (*Id.* at pp. 677–683.)

After the passage of Senate Bill 1437, section 189, subdivision (e)(3) now provides that a participant in a robbery where a death occurs may be liable for murder if the person was "a major participant in the [robbery] and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Because the factors articulated by the California Supreme Court in *Banks*, *Clark*, and *Scoggins* construe the language in section 190.2, subdivision (d), which the Legislature incorporated into section 189, subdivision (e), these factors apply when determining a defendant's eligibility for relief under section 1172.6 as a person convicted of felony murder. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 561 ["the standard under section 189, subdivision (e)(3) for holding such a defendant liable for felony murder is the same as the standard

31.

for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter"]; see generally *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419 ["[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes"].)  Thus, we look to these factors in reviewing for substantial evidence a court's finding that a defendant was a major participant who acted with reckless indifference to human life.

### B.     Analysis

Defendant also argues there was insufficient evidence she acted with reckless indifference to human life considering the factors articulated in *People v. Clark*, *supra*, 63 Cal.4th 522.  She contends "[t]he robbers did not have weapons," just duct tape, which was intended to be a form of nonlethal restraint; there was no expressed desire by any of them to kill Nunley; she had no reason to believe Nunley was going to die even though she participated in the robbery and did not aid Nunley; the robbery happened quickly; there was no evidence Gaeta or Fleming had a propensity to kill; and Nunley's death was an "unanticipated tragedy."  Accordingly, she contends the court's order denying her section 1172.6 petition to vacate her murder conviction should be reversed.  She contends "[t]he medical examiner attributed Nunley's death to the incident because there was no other potential cause of death."  Again, we conclude the trial court's finding is supported by substantial evidence in the record.

While defendant does not expressly challenge the court's finding that she was a major participant in the underlying felony, the robbery, "factors demonstrating [defendant's] role as a major participant are highly relevant to the analysis of whether [s]he acted with reckless indifference."  (*In re Loza*, *supra*, 10 Cal.App.5th at p. 52.)  Thus, we begin by considering the evidence that defendant was a major participant in the crime, which is relevant to our inquiry into whether the evidence sufficiently established

defendant acted with reckless indifference to human life. We have previously quoted the applicable factors *ante*, and do not repeat them here.

In this case, we agree with defendant the evidence did not establish defendant was necessarily involved in planning the robbery, though she was the individual who introduced Gaeta and Fleming to Nunley and led them to his trailer the day before. But defendant testified Gaeta threatened her with a knife before she went into Nunley's trailer, supporting an inference she knew Gaeta was armed. And by her own admissions during the evidentiary hearing, the court could also infer defendant was aware that Gaeta was dangerous in that she witnessed Gaeta and Fleming violently hitting and restraining Nunley, a known drug dealer, before defendant actively participated and facilitated the robbery by duct taping Nunley's hands and feet together while Gaeta went through Nunley's pockets. Thus, there was evidence from which the court could infer that defendant was aware of potential dangers posed by the nature of the crime and the conduct of the other participants.

There was also evidence to support a conclusion defendant made no attempt to aid Nunley and, by binding Nunley's arms behind his back and his legs together during the incident, defendant's actions also prevented him from moving, fighting back, or blocking any obstructions to his breathing. Defendant also made no effort to restrain Gaeta or Fleming when she saw them hitting and scuffling with Nunley. Rather, she assisted them in completing the robbery. Once the robbery was complete, defendant fled the scene with Gaeta and Fleming, and there was evidence she stayed with Fleming for days after the incident until Fleming was arrested. Most importantly, in this case, not only was defendant present at the scene of the killing and in a position to facilitate or prevent the actual murder, as discussed *ante*, there was substantial evidence her own actions played a particular role in Nunley's death in that there was substantial evidence the binding of Nunley's extremities resulted in his death. We conclude this record sufficiently establishes defendant acted as a major participant in the underlying felony.

33.

We next turn to whether there is substantial evidence in the record before us to support the trial court's conclusion defendant acted with reckless indifference to human life. We conclude there is. Here, the circumstances of the offense paired with defendant's conduct provide substantial evidence to support the trial court's conclusion defendant acted with reckless indifference to human life.

Though defendant denied she was involved in planning to rob Nunley, she witnessed Gaeta and Fleming attack Nunley, and Fleming holding him in a headlock. Defendant did nothing to aid Nunley; instead, she used duct tape to restrain Nunley so that he could not resist, thereby preventing him from fighting back and restricting his ability to reposition himself and permitting her coperpetrators to search and rob him. (See *People v. Clark*, *supra*, 63 Cal.4th at p. 619 [a defendant's "failure to provide aid while present at the scene" may be relevant].) Indeed, she used over 16 feet of duct tape to secure Nunley's arms and over six feet of duct tape to secure his legs. Defendant then helped Fleming and Gaeta complete the robbery and escape by notifying them someone was coming, and the group left Nunley bound on the floor of his trailer. There was also evidence defendant, Gaeta, and Fleming divvied up the cash and drugs taken during the robbery and Tapp saw defendant and Fleming in possession of stolen goods after the robbery occurred. Such evidence supports the trial court's finding that defendant acted with reckless indifference to human life. (See generally *People v. Medina* (2016) 245 Cal.App.4th 778, 792 [that the defendant "helped [his cohort] escape and had no concern for the shooting victim" supported special circumstance finding]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 [that the defendant "fled together with his accomplices and the robbery loot, leaving the victim to die" evidenced he was a major participant who acted with reckless indifference to human life]; accord, *Tison v. Arizona*, *supra*, 481 U.S. at pp. 151–152 [the defendants acted with reckless indifference to human life by making no attempt to assist victims before, during or after shooting, but instead choosing to assist killers in their continuing criminal endeavors].) In addition, defendant showed no

concern for the victim's wellbeing after the robbery was completed. She did not go back to remove the restraints she placed on the victim, nor did she call 911 or anyone else to have them remove the restraints or check on the restrained victim. She was only concerned with not being caught as one of the robbers/home invaders.

As to the duration of the killing, this does not appear to be a killing that occurred after "a long sequence of events." Thus, the duration of the interaction does not necessarily weigh in favor of a reckless indifference finding in this case.

However, there was evidence from which the trial court could infer defendant knew Gaeta in particular had a propensity for violence, which is the fourth *Clark* factor. It is undisputed that Gaeta and Fleming were both violent with Nunley before the defendant restrained Nunley with duct tape—at which point she could be deemed to be aware of the potential for additional violence—yet she continued to actively participate in the robbery anyway. Defendant also testified she was afraid of Gaeta and he had threatened her with a knife.

Importantly, defendant "was willingly involved in the violent manner in which the robbery took place." (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [emphasizing that defendant did not "just watch without intervening as his accomplice accosted the murder victim …, he used his weapon to keep the other victims at bay and thereby actively enabled the murder"].) She used over 20 feet of duct tape to bind Nunley's hands and legs, knowing her coperpetrators had just been violent with him. She did so while Gaeta searched his pockets, and her actions ultimately permitted the trio to rob him. Additionally, the trial court could have reasonably concluded defendant did not try to talk Gaeta and Fleming out of committing the robbery or engaging in violence during the crime.

We conclude this record sufficiently supports the trial court's conclusion defendant acted with reckless indifference to human life; that is, defendant was "aware of and willingly involved in the violent manner in which the particular offense [was]

35.

committed." (*People v. Banks*, *supra*, 61 Cal.4th at p. 801.)  This was not a situation where defendant was not present during the killing or took steps to minimize the risk of violence.  Rather, she was actively involved in the robbery and was physically present during the sequence of criminal activity culminating in Nunley's murder and the trio's escape from the scene.  (See *Tison v. Arizona*, *supra*, 481 U.S. at p. 158; *People v. Medina*, *supra*, 245 Cal.App.4th at p. 792.)  Indeed, there was evidence she played a key role in executing the criminal enterprise by restraining Nunley in an act that led to his death, permitting her cohorts to rob him.  Thus, viewing the totality of the evidence in the light most favorable to the trial court's judgment, we conclude there was sufficient evidence to support the trial court's denial of defendant's petition for resentencing.  (See *People v. Clark*, *supra*, 63 Cal.4th at pp. 622–623.)  Put differently, we cannot conclude that """"upon no hypothesis whatever is there sufficient substantial evidence to support"""" the court's finding.  (*People v. Cravens*, *supra*, 53 Cal.4th at p. 508.)

Thus, we also affirm the trial court's order on this basis.

## DISPOSITION

The court's order denying defendant's section 1172.6 petition for resentencing is affirmed.

PEÑA, Acting P. J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.

36.